1   Robert Lauson, Esq. (SBN 175,486)
        bob@lauson.com
2   Edwin Tarver, Esq. (SBN 201,943)
        edwin@lauson.com
3   LAUSON & TARVER LLP
    880 Apollo Street, Suite 301
4   El Segundo, California 90245
    Telephone:  310-726-0892
5   Facsimile:   310-726-0893
6
    Attorneys for Plaintiff,
7   Spellbound Development Group, Inc.
8
9
10              UNITED STATES DISTRICT COURT
11   CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION
12

| | |
|---|---|
| 13  SPELLBOUND DEVELOPMENT<br>GROUP, INC., a California corporation | Civil Action No. SACV09-00951 DOC<br>(ANx) |
| 14 | |
| 15          Plaintiff, | **Memorandum Of Points & Authorities<br>in support of Plaintiff's motion For<br>Preliminary Injunction** |
| 16              v. | |
| 17  PACIFIC HANDY CUTTER, INC., a<br>California corporation; FRONT LINE | **Date:  August 16, 2010** |
| 18  SALES, INC., a California corporation; and<br>DOES 1 through 20, | **Time:  8:30 a.m.** |
| 19 | **Place:  Santa Ana Courtroom 9D** |
| 20          Defendants. | **Honorable David Carter** |

21
22
23   / / /
24   / / /
25   / / /
26   / / /
27
28

# MEMORANDUM OF POINTS & AUTHORITIES

## Table of Contents

I. Factual Background ............................................................................... 1

II. A Preliminary Injunction Should Be GRANTED ................................ 3

III. Spellbound Is Highly Likely To Succeed On The Merits .................. 3

    A.  The RAZE Safety Cutter Infringes the Votolato '029 Patent ........ 4

    B.  The Votolato '029 Patent Is Valid ................................................. 5

        i.  The John '640 Patent Does Not Anticipate The '029 Claims ... 5

        ii. The Ortner '873 Patent Is Not Disabling Prior Art ............... 6

        iii. The Berns '832 Patent Discloses A Very Different Device ... 6

        iv. '029 Claims Can Also Be Distinguished From The Marshall

           '559 Patent ............................................................................ 7

        v.  The Kahl '926.6 Utility Model Fails as Disabling Prior Art 7

        vi. Asserted Prior Art Cannot Be Modified/Combined to Render

           '029 Patent Obvious ............................................................. 9

    C.  The RAZE Knife Infringes Claims 3, 4 Of The John '640 Patent .. 12

    D.  The John '640 Patent Claims 3, 4 Are Not Invalid In View of Kahl .. 13

    E.  The RAZE Knife Infringes the Votolato '928 Patent Claim 9 ...... 15

    F.  The Votolato '928 Patent Claim 9 Is Not Invalid In View Of John 16

    G.  At Least Claim 9 Of '928 Patent Not Invalid In View Of Marshall .. 17

    H.  Defendants' Improper Inventorship Defense Will Fail ................. 19

    I.  The Patents-In-Suit Are Otherwise Fully Enforceable ................. 19

IV.  Spellbound Will Suffer Irreparable Harm If Defs. Are Not Enjoined .. 20

V.  The Balance Of Hardships Weigh Sharply In Favor of Spellbound .... 23

VI.  The Public Interest Is In Enforcing The Patents-In-Suit ................... 24

VII.  The Injunction Will Preserve The Status Quo ............................... 24

VIII.  Only A Minimal Bond Should Be Required ................................. 26

## Table of Authorities

### Cases

Abbott Labs v. Sandoz 544 F.3d 1341 (Fed. Cir. 2008)                                3, 20

Allergen Sales v. Pharmacia & Upjohn 41 USPQ2d 1283 (S.D. Calif. 1996)              21

Amazon.com v. Barnesandnobel.com 239 F.3d 1343 (Fed. Cir. 2001)                     22

Amgen v. Hoechst Marion Roussel 314 F.3d 1313 (Fed. Cir. 2003)                      8

Atlas Powder v. Ireco Chems. 773 F.2d 1230 (Fed. Cir. 1985)                         25

A.W. Indus. v. Electronic Connector Serv. 46 USPQ2d 1218 (S.D. Fla. 1997)           22

Bellsouth Telecomms. V. MCIMetro Access Trans. 425 F.3d 964 (11th Cir. 2005)      26

Bio-Tech Gen. v. Genentech 80 F.3d 1553 (Fed. Cir. 1996)                            20

Boehringer Ingelheim v. Schering-Plugh 106 F.Supp.2d 696 (D. NJ 2000)               22

Bristol-Myers Squibb v. Ben Venue Labs 246 F.3d 1368 (Fed. Cir. 2001)               8

Burlington Indus. v. Dayon Corp. 849 F.2d 1418 (Fed. Cir. 1988)                     4

Canon Computer Systems v. NuKote Int'l 134 F.3d 1085 (Fed. Cir. 1998)               19

Chem. Trainer Indus. v. Wilkin 44 USPQ2d 1114 (C.D. Cal. 1997)                      21

Colonial Data Tech. v. Cybiotronics 41 USPQ2d 1763 (D. Conn. 1996)                  21

Cordis Corp. v. Medtronic 835 F.2d 859 (Fed. Cir. 1987)                             24

CVI/Beta Ventures v. Custom Optical Frames 859 F. Supp. 945 (D. Md. 1994)           21

Decade Indus. v. Wood Tech. 100 F. Supp 2d 979 (D. Minn. 2000)                      21, 27

Ethicon Endo-Surgery v. U.S. Surgical 855 F. Supp. 1500 (S.D. Ohio 1994)            21

FMC v. Manitowoc 835 F.2d 1411 (Fed. Cir. 1987)                                     20

Fraige v. Classic 230 USPQ 223 (C.D. Cal. 1985)                                     26

GoTo.com v. Walt Disney 202 F.3d 1199 (9th Cir. 2002)                             27

Gordon Johnson v. Hunt 109 F. Supp. 571 (N.D. Ohio 1952)                            27

H.H. Robertson Co. v. United Steel Deck 820 F.2d 384 (Fed. Cir. 1987)               3

Hybritech v. Abbott Labs 849 F.2d 1446 (Fed. Cir. 1988)                             22

| | | |
|---|---|---|
| 1 | Kaepa v. Achilles 76 F.3d 624 (5th Cir. 1996) | 26 |
| 2 | Kegal Co. v. AMF Bowling 127 F.3d 1420 (Fed. Cir. 1997) | 3 |
| 3 | Kristar Enterprises v. Revel Environ. 1998 WL 886623 (N.D. Cal.1998) | 23 |
| 4 | Lifescan Inc. v. Polymer Tech. Int'l 35 USPQ2d 1225 (W.D. Wash. 1995) | 21 |
| 5 | Litton Sys. v. Sundstrand Corp. 750 F.2d 952 (Fed. Cir. 1984) | 25 |
| 6 | Modine Mfg. v. Allen Group 917 F.2d 538 (Fed. Cir. 1990) | 4 |
| 7 | Minnesota Mining & Mfg. Co. v. Chemque 303 F.3d 1294 (Fed.Cir. 2002) | 9 |
| 8 | Oakley v. Sunglasses Hut Int'l 316 F.3d 1331 (Fed. Cir. 2003) | 3, 21 |
| 9 | Polymer Tech. v. Bridwell 103 F.3d 970 (Fed. Cir. 1996) | 20 |
| 10 | Precise Exercise Equip. v. K-Mart 59 USPQ2d 1566 (C.D. Cal. 2000) | 23, 24 |
| 11 | Purdue Pharma v. Boehringer 237 F.3d 1359 (Fed. Cir. 2001) | 20 |
| 12 | Reiffin v. Microsoft 158 F. Supp.2d 1016 (N.C. Calif. 2001) | 23 |
| 13 | Robbins v. Stud Rail Mfg. Co. 32 USPQ2d 1882 (N.D. Ohio 1994) | 27 |
| 14 | Schawbel Corp. v. Conair Corp. 122 F. Supp. 2d 71 (D. Mass. 2000) | 21, 23 |
| 15 | Sidel v. Uniloy Milacron 61 USPQ2d 1481 (N.D. Ga. 2001) | 24 |
| 16 | Univ. of Texas v. Camenisch 451 U.S. 390 (1981) | 24 |
| 17 | Wang Labs v. The Chip Merchant 28 USPQ2d 1677 (S.D. Calif. 1993) | 22 |

18
19
20

### **Other Authorities**

21
| | | |
|---|---|---|
| 22 | Amer. Heritage Dictionary of the English Language (4th Ed. 2009) | 15 |
| 23 | Collins English Dictionary (2003) | 15 |
| 24 | MPEP (Manual of Patent Examining Procedure) | 5, 14 |

25
26
27
28

# I.  Factual Background

Plaintiff Spellbound is a small company with about eight (8) employees located in Irvine here in Orange County, that develops and sells safety-related products, primarily to the food service and food-processing industries, as well as convenience stores. Votolato Decl., para. 2. Presently about 70% of Spellbound's business is selling disposable safety cutters, or inexpensive box cutter knives with safety features to prevent lacerations, and the knives being discarded when the blade dulls rather than replacing the blade, offering the important benefit of ensuring that loose blades do not end up in food products or otherwise cause injury. Id.  Being submitted with this motion are samples of Spellbound's latest generation safety cutter, model X-CU, along with Defendant's accused infringing Raze Safety Cutter product. Id., para. 3, Exs. A, B.  Plaintiff also sells other safety-related products including floor mats, finger guards, caution signs, slip-resistant shoes, and safety publications such as posters, and employee-awareness training guides. Id., para. 2.

Plaintiff's founder Earl Votolato started Spellbound in about 1992, being motivated to get into the employee safety business after growing up without a father who had died in a workplace accident right before Earl's birth. Id., paras. 2,4.  Since Spellbound's first generation of disposable safety cutters were developed, and new and improved versions invented by Votolato (and co-inventor David Sharbaugh), patents were generally filed on each significant improvement such that a small portfolio of patents exist covering these products, including the two Votolato patents-in-suit. Id., para. 4.  Through about 18 years of hard work and dedication, Spellbound has accomplished its objective of helping companies prevent workplace accidents and successfully stayed in business. Id., para. 3. Plaintiff now sells its disposable safety cutters to about 18 of the top 20 fast food chains in the U.S. Id.  Although Spellbound sells to many chains, most of those restaurants are owned by franchisees, and thus even if headquarters approves a product from a particular source, not all the stores will necessarily purchase it or from the approved source. Id.

Over the past year Defendant Pacific Handy Cutter ("PHC"), a direct competitor in the Safety Knife Business, has been causing to be manufactured a Raze RSC-432 safety

cutter that infringes the patents-in-suit. Id., para. 6.  PHC distributes the knife primarily through Defendant Front Line Sales ("Front Line"), with Front Line's sales staff including Michael Woods, former vice-president of sales at Spellbound who was terminated by Spellbound in July, 2000. Id.  Spellbound initially filed suit against PHC and Front Line asserting only the Votolato U.S. Patent No. 7,356,928 (the '928 patent"), and upon doing so PHC's attorneys asserted all claims were invalid in view of the John U.S. Patent No. 6,718,640 ("the '640 patent").  Spellbound's attorneys contacted the owner of the '640 patent, domiciled in the UK, and arranged for an assignment of that patent to Spellbound. Then Spellbound amended the complaint to assert infringement of the '640 patent along with the '928 patent.  On June 1, 2010 Spellbound's U.S. Patent No 7,726,029 ("the '029 patent") was issued, and on June 4, 2010 the second-amended complaint ordered filed which asserts infringement of numerous claims of the '029 patent.

From January-May, 2010 for several months the parties continuously discussed settlement but no settlement was reached. Id., para. 7.  In early June, 2010 Spellbound learned for the first time that Stanley Black & Decker ("Stanley") was advertising and selling the accused infringing product, A Stanley® Retractable Blade Hood Safety Knife 10-783.  Id., para. 8. This was a major escalation of the infringing activities because Stanley is the world's largest hardware distributor, selling its goods through such retail chains as Home Depot, Lowes, Wal-Mart, Ace Hardware, etc. Id.  Spellbound provided notice letters of the infringement to Stanley including an attached advertising showing Stanley® safety knifes for sale and imposed a deadline for them to cease-and-desist.  Id. para. 9, Ex. C, D.  No response was received.  Spellbound's motion for leave to amend to file a third-amended complaint naming Stanley as a Defendant is pending and set for hearing on July 26th.  Rather than stipulate to the well-founded motion to amend, Defendants filed an ill-conceived ex-parte application for a TRO that Spellbound be ordered not to communicate with Stanley, because such communications interfered with their business relationship.  This Court properly denied that ex-parte application.

Unfortunately Spellbound is already feeling the effect of Defendants' infringing

activities. Id. para. 10.  In the past year Spellbound has been forced to dramatically lower its price for the patented products from $1.80 to as low as $1.19, to meet Defendants offering the infringing products for as little as $1.08. Id.  While the bad economy the past year may be partly to blame, it is common knowledge the fast food industry has been much less affected than most other parts of the economy, e.g. real estate/construction, luxury goods, etc. Id.  Trial in this matter is not scheduled to commence until April 5, 2011 at the earliest.  With Stanley's broad reach, Spellbound's customers may soon be able to go to their local big box retailer or discount store and buy the accused products at even lower prices, threatening Spellbound's viability as an ongoing business. Id., para. 11.

## II. A Preliminary Injunction Should Be GRANTED

The factors relevant to the grant or denial of a preliminary injunction are (1) likelihood of success on the merits, (2) whether irreparable harm is likely if the injunction is not granted, (3) the balance of hardships as between the litigants, and (4) factors of the public interest. Abbott Labs v. Sandoz 544 F.3d 1341, 1344 (Fed. Cir. 2008, citing Oakley v. Sunglasses Hut Int'l 316 f.3d 1331, 1338-39 (Fed. Cir. 2003), H.H. Robertson Co. v. United Steel Deck 820 F.2d 384, 387-88 (Fed. Cir. 1987).  "At the stage of the preliminary injunction, before the issues of fact and law have been fully resolved, 'the purpose of a preliminary injunction is merely to preserve the relative position of the parties until a trial on the merits can be held.'" Id. at 1334-45, citing Univ. of Texas v. Camenisch 451 U.S. 390, 395 (1981).

## III.  Spellbound Is Highly Likely To Succeed On The Merits

In a patent case the burden of proving infringement is on the Plaintiff, by a preponderance of the evidence. Kegal Co. v. AMF Bowling 127 F.3d 1420 (Fed. Cir. 1997).  As to Defendants' affirmative defenses that the patents are invalid or unenforceable, Defendants have the burden to prove they would be likely to succeed on such issues at trail, which require clear and convincing evidence. Abbott Labs v. Sandoz 544 F.3d 1341, 1346, 1364 (Fed. Cir. 2008).  For Defendants' enforceability defenses based on fraudulent procurement (e.g. that proper inventors were intentionally not named)

1  or inequitable conduct (material prior art was intentionally not disclosed), Defendants

2  have the burden of proving same by clear-and-convincing evidence.   Modine Mfg. v.

3  Allen Group 917 F.2d 538 (Fed. Cir. 1990)(establishing that a patent was procured by

4  fraud or with such egregious conduct as to render it unenforceable requires clear,

5  unequivocal and convincing evidence of an intentional misrepresentation or withholding

6  of a material fact from the PTO); Burlington Indus. v. Dayon Corp. 849 F.2d 1418 (Fed.

7  Cir. 1988)("court should find inequitable conduct only if shown by clear-and-convincing

8  evidence").  Here the patents are being infringed and Defendants are unable to present any

9  clear case of invalidity or unenforceability.

10  **A.  The RAZE Safety Cutter Infringes the Votolato '029 Patent**

11         The RSC-432 accused product includes all elements recited in claims 1-5 of U.S.

12  Patent No. 7, 726,029 patent, including the limitation that "the trigger comprising a trigger

13  pathway in which at least a portion of the pawl travels as the blade cover covers or

14  uncovers the blade," and therefore infringes on those claims.

15         Regarding claim 1 of the '029 patent, looking at the claim charts and annotated

16  photos of Claim Chart I, it the RSC-432 includes a trigger (108) with a trigger pathway

17  (138) through which the pawl (110) travels when covering or uncovering the blade (104).

18  The trigger pathway (138) formed within the trigger (108) body is indicated in Figure 15

19  with a dashed yellow box.  In Figure 16, the pathway (138) receives portion (126) of the

20  pawl (110) and guides its travel (indicated by arrow I) as the blade cover (106) rotates.

21         In order to move the pawl (110) upwards, the disengager (136) must connect with a

22  very narrow shelf (1.5 mm wide) of the ramped step (128).  The trigger pathway (138) and

23  disengager (136) prevent sideways movement of the pawl (110), to reliably align the

24  ramped step (128) with the disengager (136).  If the pawl (110) was not guided within the

25  pathway (138), the pawl (110) would be *able to pivot to the side by almost 3 mm*.  This

26  would cause the disengager (136) to lose contact with the ramped step (128).  The '029

27  patent, describes that "the pathway is configured to hold the pawl;" in other words, the

28

4

pathway prevents undesired motion of the pawl by providing guidance.  See Votolato '029 col. 5, lines 29-30.

**Defendants concede the '029 patent is infringed.**  See, Supp. Answer to Interrog. No. 2 (Lauson Decl., para. 2, Ex. J).

### B.  The Votolato '029 Patent Is Valid

Defendants contend that the '029 patent is invalid because 1) John's channels can be moved from the handle to the trigger; 2) the Ortner '873 patent "anticipate[s] or render obvious the claims," without providing any explanation or reasoning; 3) the Berns '832 patent was "material" to examination; 4) the Marshall '559 patent has a rod that is equivalent to a pawl; and 5) Kahl 929.6 has a transfer member that "fulfills the function of a pawl" and that the "push button (20) acts as a stop."  See, Supp. Answer to Interrog. No. 4 (Lauson Decl., para. 2, Ex. J).  Defendant's contentions, as best can be understood, lack merit.

Lacking a cited authority, Defendants also contend that the '029 patent improperly claimed priority as a divisional.  See Supp. Answer to Interrogatory No. 4 (Lauson Decl., para. 2, Ex. I).  However, a "divisional application is *often* filed as a result of a restriction requirement," but not always.  See MPEP §201.06, (Exhibit M).  Therefore, '029 patent with no new matter properly depends on the '677 application.

### i. The John '640 Patent Does Not Anticipate The '029 Claims

John's '640 patent fails to disclose "a trigger pathway in which at least a portion of the pawl travels."  Looking at John's Fig. 1, the trigger (tongues 52 and 54) *lacks a trigger pathway* in which the pawl may travel.  John's triggers (52 and 54) are thin, flap-like structures which may be bent in to engage and lift the strut (34) with projections (56). Since, <u>first</u> the inner surface of the trigger is flat, <u>second</u> a projection cannot serve as a "pathway," and <u>third</u> the pawl (strut 34) is spaced away and separate from the trigger, no part of the trigger may serve as a pathway for the pawl.  For all these reasons, the claims of the '029 patent are not anticipated in view of the John patent.

**ii. The Ortner '873 Patent Is Not Disabling Prior Art**

1
2   Ortner cannot serve as prior art to invalidate the '029 patent, since the priority date
3   of the '029 patent *precedes Ortner's patent date*.  See 35 U.S.C. §102(b).  Ortner's patent
4   date is May 13, 2003, which is six months after the '029 patent's November 19, 2002
5   priority date (claiming priority from parent application 12/383,677, which in turn claims
6   priority from Votolato patent no. 7,509,742).  Further, Defendant failed to meet its burden
7   by not specifically pointing out the reasons that the Ortner invalidated the '029 patent

8   Nevertheless, Ortner fails to teach a trigger with "a trigger pathway in which at
9   least a portion of the pawl travels."  If the latch (13) were to be considered a "pawl," the
10   latch (13) is *completely separate from the trigger* (10); the trigger (10) only engages the
11   latch (13) through the release lever (15).  This indirect relationship between the trigger
12   (10) and latch (13) creates a complex and expensive locking mechanism.  This substantial
13   difference was not lost on the Examiner of the '029 patent who allowed the claims.

**iii. The Berns '832 Patent Discloses A Very Different Device**

14
15   The Berns '832 patent fails to disclose all of the claimed elements of the '029 patent
16   and was <u>not material</u> to its examination.  Defendant failed to meet its burden by not
17   providing rationale regarding validity.  The Berns 6,070,326 patent, disclosed in
18   prosecution, relies on the same German parent patent DE19825941.7 and both disclose the
19   same wire blade guard (22) that distinguishes these references from the '029 patent.

20   The single piece bent wire guard (16) in Berns' bag-opening knife (10) serves two
21   goals: <u>first</u>, to "pull the material of the bag taught between" the wire sections (22) to
22   facilitate the piercing of the bag, and <u>second</u>, to permit the wire pins (17) of the guard (16)
23   to extend straight through the length of the body (11) to connect to the locking
24   mechanism. *See* col. 3, lines 18-50, col. 4, lines 1-13, and Figs. 1-4.  These design goals
25   also create disadvantages, in that the *wire guard (16) does not cover the blade*; it merely
26   "surrounds" the blade (12), forming a permeable perimeter that permits dangerous user
27   contact with the blade. *See* col. 3, line 46.  Further, the wire guard (16) is not "pivotally
28   coupled to the handle."  Berns' disadvantaged design requires the wire guard (16) to slide

1   through guide bores (19) under both an inward force and also a sideways cutting force

2   which causes binding and jamming of the wire guard (16) through the bore (19) as the

3   user cuts along a surface.

4   **iv. '029 Claims Can Also Be Distinguished From The Marshall '559 Patent**

5           Marshall does not teach or disclose a safety cutter with "trigger coupled to the

6   handle and configured, upon actuation, to disengage the pawl from the stop." Actuating

7   button (55) causes a rotation in disk (52) which has an abutment (57) formed thereon.

8   The "abutment 57 is rotated out of engagement with the rod 41" to permit the passive rod

9   (41) to move relative to the disk (52), permitting the guard (39) to retract. *See* col. 8, lines

10  1-8 and Figs. 6, 8 and 10. So, Marshall's button (55) does not disengage or even move the

11  rod (41) or any other part that may serve as a pawl. The only way that the rod (41) may

12  be moved is if the user pushes in the attached guard (39). *See* col. 8, lines 12-18.

13          Further, Marshall fails to teach that a pawl travels in a pathway to allow the locking

14  of the blade cover <u>or</u> that a pawl is allowed to "return to a locked position when the trigger

15  has not been released". When the rod (41) is retracted past the abutment (57), it actually

16  prevents the return rotation of the disk (52) since the abutment (57) will strike the side of

17  the rod (41) and not permit relocking when the rod (41) is retracted. When the button (55)

18  is not released, the disk (52) and connected abutment (57) remain rotated away from the

19  retracted rod (41) so that continued actuation of the button (55) will not permit the rod

20  (41) to be in a locked position, lacking the required abutment (57).

21  **v. The Kahl '926.6 Utility Model Also Fails as Disabling Prior Art**

22          Kahl fails to teach or disclose "a pawl coupled to the blade cover... [and]

23  configured to engage a stop when the blade cover is in the locked safety position" or a

24  trigger pathway in which "a portion of the pawl travels. In Kahl, the blade cover (14)

25  independently rotates about pivot (30), while pawl (18) connects to and rotates with the

26  transfer element (22) about axis (32). Pawl (18) is configured to engage a stop (the right

27  wall of recess 24) when the blade cover (14) is locked, but *is not coupled* in any way to

28  the blade cover (14). In fact, in order to properly operate, the pawl (18) must be slightly

spaced from the stop (recess 24) to permit unhindered rotation.   Further, the separate motion of the pawl (18) relative to the blade cover (14), actually requires that they *not be coupled* together.   Moreover, since the pawl (18) is located beneath the cover, *no portion of the pawl* (18) travels in a trigger pathway.

Defendants contended that 1) Kahl's "transfer [element] (22) fulfills the function of a pawl" by fitting "into a notch in the blade cover" to lock it and 2) the "push button (20) acts as a stop." See, Supp. Answer to Interrog. No. 4 (Lauson Decl., para. 2, Ex. J).   The transfer element (22) *cannot be considered a "pawl"* and the stepped recess (26) of button (20) *does not act as a "stop,"* since Kahl's transfer element (22) fails to teach the limitation that it is "coupled to the blade cover … [and] configured to engage a stop." First, the transfer element (22) is *not coupled to the blade cover* (14).   Kahl's middle figure shows the transfer element (22) pivotally connected to pawl (18) and moving completely separately from the blade cover (14).   This separation is required by Kahl's design, since the transfer element (22) is designed to disengage pawl (18) from the blade cover (14).   Second, the stepped recess (26) in the button (20) *cannot act as a stop*, since the stop is described in the '029 patent as limiting travel of parts, not causing travel as the transfer element (22) does.   See '029, col. 4, lines 57-59.   In the locked position (top figure) an upward force on the blade cover (14) would not push the transfer element (22) up into the step (26) in the button (20) and would thus *not "stop" the motion* of the cover (14) or any other part.   The transfer element (22) serves only to disengage.

Kahl's disclosure fails the enablement requirement which demands the description use "full, clear, concise, and exact terms as to enable any person skilled in the art … to make and use the [invention]." *See* 35 U.S.C. § 112, para. 1.   [1]  The Federal Circuit has long held that a "claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled." Amgen v. Hoechst Marion Roussel 314 F.3d 1313, 1354 (Fed. Cir. 2003).   See also, Bristol-Myers Squibb v. Ben Venue Labs 246 F.3d 1368, 1374 (Fed. Cir. 2001) ("To anticipate, the reference must also enable one of skill in the art to make and use the claimed invention.").

1       Kahl's device is shown only in simple schematic, "back of the envelope" form,

2   lacking all detail and instruction on how the device may be made or exactly how the

3   locking mechanism works.  Kahl's disclosure leaves much to the imagination and would

4   require "undue experimentation" to "make or carry out" the invention.  <u>Minnesota Mining</u>

5   <u>and Mfg. Co. v. Chemque</u> 303 F.3d 1294, 1301 (Fed.Cir. 2002).  An example of an

6   unresolved problem, is that there is no detail on how the transfer element (22) is

7   connected to the pawl (18) and how the transfer element (22) is configured to move

8   between the shallow and deep portions of the stepped recess (26) in order to unlock and

9   re-lock.  Comparing Kahl's top figure with the bottom figure, the transfer element (22) is

10  shown moving from a twelve o'clock position to one o'clock, where a "joint" (the little

11  black dot) permits flexing between the pawl (18) and element (22).  However, there is *no*

12  *discussion* on how the joint is flexible enough to permit this transition, yet stiff enough to

13  overcome friction to pop it into the deeper step of the recess (26) while under the pressure

14  of the depressed button.  Kahl therefore leaves to the imagination many of the design

15  choices a manufacturer would be required to discover, such as material choices, an exact

16  designation of how each joint operates, numerous interference issues, and certainly

17  numerous other design problems that are commonly encountered when bringing a design

18  from a rough idea to a finished, fully enabled invention.

19      This lack of enablement is more easily understood when considering that the Kahl

20  reference is merely a registered utility model (Gebrauchsmuster) and *not an examined*

21  *patent*.  With a utility model, *no substantial examination occurs*.  *See*

22  <http://dpma.de/english/utility_models/index.html>.  So, unlike an examined US utility

23  patent, Kahl's utility model was merely checked for the presence of the required

24  application parts.

25  **vi. Asserted Prior Art Cannot Be Modified/Combined to Render '029 Patent Obvious**

26      Defendants failed to meet the burden of an obviousness rejection, by not describing

27  in detail how the prior art may be combined or modified to create the claimed invention,

28  and failed to describe the motivation for making such combinations or modifications.

1    Regarding John, the recess (46) cannot be modified or moved from the body to the
2    trigger (52) as the Defendants contend, because it would completely *cease to function as*
3    *intended*. The trigger (52) is pushed in towards the pawl (34) to lift it relative to the
4    buttress (50) within the recess (46), to permit the lugs (42, 44) to travel on a one-way
5    circuit along the steps and ramps of the recess (46). See col. 5, lines 25-33. This requires
6    that the lugs (42, 44) flex in and out relative to and on the ramps and steps of the recess
7    (46) in order to properly engage. If the recess (46) was to be repositioned onto the trigger
8    (52), there would be a complex interaction where the lugs (42, 44) move on the ramps and
9    steps while, simultaneously, the ramps and steps within the recess (46) are moving
10   towards and away from the lugs (42, 44) with the moving of the trigger. Imagine if a user
11   were to change the deflection by releasing the trigger (52) while the lugs (42, 44) are
12   moving down the one-way ramp; the lugs (42, 44) would lose contact with the ramp (64)
13   and permit two-way travel of the lugs (42, 44). Moreover, the thick wall requirement of
14   John's deep recess (46) is incompatible with the trigger's (52) thin wall requirement that it
15   be flexible to permit inward deflection.

16   John's recess (46) needs to be a substantial distance away from the trigger (52).
17   This is due to the small projection (56) that imparts a small upward lift to the pawl (34)
18   that is magnified along its length, so that the lugs (42, 44) are lifted more than double the
19   small deflection to bypass the buttress (50). These projections (56) cannot be increased in
20   size or angle to increase the lift due to: first internal space limitations (see Fig. 2), second
21   the limited ability of the flap-like trigger (52) to bend any further inward without fatiguing
22   and breaking at the root, and third significant user difficulty in pushing in a trigger (52)
23   with a ramped interface that would need to be steeply angled to provide the needed lift
24   distance at the proposed close proximity.

25   Regarding Ortner, if somehow a pathway were to be formed in the button (10), the
26   latch (13) that locks the hood (6) does not change position such that it could travel within
27   that pathway. It instead flexes only slightly sideways to disengage the lug (hood lock 22)
28   from the hole (23) in the hood (6). See col. 6, lines 1-10 and Figs. 7 and 16-19. All this

10

flexure or movement of the latch (13) occurs within the confines of the hood (6) and no movement occur anywhere near the button (10). Further, Ortner teaches that the actuation of the latch (13) occurs through the release lever (15) mounted to the bottom of button (10), teaching away from modifying to add a trigger pathway for a pawl to travel within. See col. 6, lines 3-10 and Figs. 2-3.

Regarding Berns, his device cannot be combined with the teachings of others to provide a "blade cover," because Berns shows no means to permit the blade to be completely covered and provide clearance for the retracted cover while maintaining the required guide bore (19) design. If the guide bore (19) was to be moved back into the handle in the attempt to provide retracted blade cover clearance, the distance between the tip (23) of the wire guard (16) and the guide bore would be more than doubled, such that the binding and jamming problem described above would be exacerbated to the point of uselessness, due to the increased moment arm and bending of the unguided wire.

Regarding Marshall, in order to properly operate as designed, the device cannot be modified and must have a button (72) that is separate from the rod (41), since the button is designed to rotate the abutment (57) relative to the rod (41) in order to unlock the guard (39) attached to the rod (41). Further, the rod (41) is connected to the guard (39) with a spring (51) that biases the guard outward, such that only the guard (39) may actuate the rod (41) "by outside pressure." See col. 8, lines 7-8. So, Marshall actually teaches away from connecting the rod (41) to the trigger (55), since the trigger (55) is designed to actuate the stop (57) and the guard (39) is designed to separately actuate the rod (41).

Regarding Kahl, his device cannot be modified or combined with the teachings of others to couple the pawl (18) to the blade cover (14) or to cause the pawl (18) to move within a "trigger pathway." As described above, Kahl teaches away from "coupling" the pawl (18) to the cover (14), since the middle figure shows they are designed to move away one from the other as a non-coupled pair. Kahl, shows no motivation to place the pawl (18) near the trigger (20), such that it could travel in a "trigger pathway," since his

11

1    locking and relocking mechanism requires a transfer element (22) pivotally connected to

2    the pawl (18), where the transfer element is the sole part engaged with the trigger (20).

3    **C.  The RAZE Knife Infringes Claims 3, 4 Of The John '640 Patent**

4         The RSC-432 includes all elements recited in claims 1, 3 and 4 of the '640 patent,

5    including the limitation that "the guard member is displaced through a predetermined

6    distance" and where "the distal end of the strut [is] arranged to follow a loop;" and

7    therefore infringes on at least claims 3 and 4, as can be seen in Claim Chart II.

8         Defendants contend that the RSC-432 blade guard is not required to travel a

9    predetermined distance to *return to a safety position*, since "any distance traveled is

10   sufficient to lock the blade guard." See, Answer to Interrogatory No. 1 (Lauson Decl.,

11   para. 2, Ex. J). As discussed below, this contention is clearly erroneous.

12        The predetermined distance through which the guard member (204) is displaced is

13   determined exclusively by two factors 1) the construction of the knife locking mechanism

14   and 2) the user's input.  So logically, both factors are involved with the predetermination

15   process.  For both John's device and the RSC-432, the user may decide to actuate the

16   trigger and then release the trigger, where the predetermined distance is a displacement of

17   zero.  The pawl would drop back into place next to the buttress with both cutters and the

18   blade guard would re-lock.

19        Of course, when the RSC-432 cutter *is used as it is reasonably intended to be used*,

20   i.e., retracting the locked guard member (204) to expose a blade (202) and "[return] to a

21   safety position," its guard member (204) *must minimally travel a* non-zero *predetermined*

22   *distance* that is dictated by the very construction of the locking mechanism (206), just like

23   the John invention.  Comparing Fig. 3 with Fig. 4 in Claim Chart II, in Fig. 3 the trigger

24   (208) is shown in a second position (212), where the arm (224) pushes the strut (216)

25   upward by catching elongated step (222) by the bottom so that the distal end (218) is free

26   of the buttress (234).  The point on the step (222) of contact is shown encircled and

27   marked with "Start Position;" the guard member is similarly marked.  In Fig. 4, in order to

28   begin the cycle of releasing the guard member (204) from its safety position, the guard

1    member (204) must move through a predetermined distance shown dimensioned both on

2    the guard member (204) and at the step (222). This distance is predetermined by the

3    length of the step (222). The longer this step (222) is, the longer the predetermined

4    distance. In order to return the blade guard (204) to the safety position during normal use,

5    *the guard member* (204) *must be displaced* a specified distance (roughly 3 to 4 mm) so

6    that the connected strut (216) and step (222) are moved beyond contact with the arm (224)

7    so that the strut (216) can be pulled back down next to the buttress (234) to the locked

8    safety position.

9         Thus, PHC's claim that "any distance traveled [by the RSC-432's guard member] is

10   sufficient to lock the blade guard" is clearly erroneous. Therefore, the guard member of

11   the RCS-432 is displaced through a predetermined distance, whether that

12   predetermination is made by the user or by the design of the cutter.

13        Regarding Claim 3, the locking action within the locking mechanism (206) is

14   provided by the strut (216) pivotally joined at one end to the guard member (204) with

15   pivot (220) and the distal end (218) may selectively engage a buttress (234) to lock the

16   guard member (204). Further, looking at Fig. 5 in Claim Chart II, the distal end (218) of

17   the strut (216) follows a loop (226) that is within the meaning of the term loop as

18   contemplated by John's inventive disclosure. John's device, shown in Fig. 6, shows the

19   John loop (228) marked with a dashed line, where the distal end (230) *completes one full*

20   *circuit or loop*. In a similar manner, the RAZE distal end (218) is arranged to follow a

21   loop (226) marked with a dashed line, where the distal end (218) returns to its original

22   position next to the buttress (234). Thus the RSC-432 possesses each and every element

23   of claims 1, 3, and 4, and therefore infringes at least claims 3 and 4.

24        **D.  The John '640 Patent Claims 3, 4 Are Not Invalid In View of Kahl**

25        Defendants contend that "the '640 patent would have not been patentable had the

26   Examiner" had access to the Kahl reference and is invalid since Kahl can relock

27   regardless of button position. Defendants conceded that Kahl does not meet the

28   "predetermined distance" claim limitation. See, Answer to Interrogatory No. 3 (Lauson

13

1    Decl., para. 2, Ex. J). Kahl also fails to teach or disclose a "strut which is pivotally joined
2    to the guard member." Consider if Kahl's transfer element (22) was to be contemplated as
3    the claimed "strut." It can be clearly seen in the Kahl figures that the strut (transfer
4    element 22) is connected to the pawl (18) and *is not pivotally connected* to the guard
5    member (blade cover 14). In fact, the pawl (18) and strut (22) are shown connected and
6    rotating together about pivot (32), while the guard member (14) is shown rotating on a
7    *completely separate pivot* (30). The top figure shows the guard member (14) covering the
8    blade (12) with the strut (22) vertical and within the shallow recess of the button (20).
9    The bottom figure shows the guard member (14) *still* covering the blade (12) with the
10   strut (22) in the one o'clock position within the deeper recess, demonstrating that the strut
11   (22) moves independently of and is not pivotally connected to the guard member (14).
12        Defendant's questioning of the applicant's "good faith" for failing to submit an
13   English translation of Kahl, is inconsistent with the guidelines set forth in the Manual of
14   Patent Examining Procedures (MPEP). See Answer to Interrogatory No. 3 (Lauson Decl.,
15   para. 3, Ex. J). When a reference is cited in the information disclosure statement (IDS)
16   that "is not in the English language, but was *cited in a search report* … the requirement
17   for a concise explanation of relevance *can be satisfied by submitting an English-language
18   version of the search report."* MPEP 609.04(a)(III) (Eighth Edition, 2008) (Emphasis
19   added). See Exhibit L. The Applicant properly submitted the International Search Report
20   on October 23, 2001, fully satisfying the Applicant's duty of disclosure. See Exhibit N.
21   Therefore, the USPTO examiner had full access to Kahl and *found it to be an irrelevant
22   and a weak prior art reference.*   For all these reasons, claims 3 and 4 of the John '640
23   patent are not anticipated in view of Kahl.
24        Claims 3 and 4 of the '640 patent are not obvious over Kahl, since the sole purpose
25   of Kahl's transfer element (22) is to activate and rotate a pawl (18). In order for the pawl
26   to serve to unlock and re-lock the blade guard (14) as disclosed, the pawl (18) and transfer
27   element (22) must rotate and move independently of the blade cover (14). If Kahl's pawl
28   (18) were to be "pivotally joined" to the blade cover (14), it would cease to operate in the

14

intended locking and automatic re-locking manner, since there would be no means to release the pawl (18) from its recess (24) to unlock the cover (14). Therefore, Kahl's device teaches away from pivotally connecting the strut to the guard member.

### E.  The RAZE Knife Infringes the Votolato '928 Patent Claim 9

As the patentee did not intend any special meaning, the court should make a preliminary claim interpretation that "catch" has the ordinary meaning of "to hook." See Collins English Dictionary (2003); see also The American Heritage Dictionary of the English Language (4th Ed. 2009). Claim 1 recites that the pawl includes "a second portion that operates against a catch to *bypass the stop*." The primary purpose of the catch is to hook with or snag the second portion to unlock the blade guard by bypassing the stop. See '928, col. 2, lines 1-4 (An embodiment utilizes "a pawl [that] cooperates with a stop to reduce movement of the guard while the guard is in a locked position, and a simple latching mechanism that allows the pawl to bypass the stop").

Defendants contend that the catch is "a structure in the knife that is used to *limit motion*," contrary to its true function of allowing the bypassing of the stop. See, Answer to Interrogatory No. 1 (Lauson Decl., para. 3, Ex. L). Contrary to this misinterpretation, the specification of the '928 patent clearly describes the actual structure that does limit the motion of the blade guard, stating that "the maximum distance between the finger [46] … and the stop 52 determines the play" and "[locking] is accomplished by the approximate juxtaposition of joint 45 and finger [46] … against stop 52." See '928 Patent col. 3: 58-62.

Moreover, one of the primary purposes of the '928 invention was to provide a "utility [knife] where a blade guard automatically re-locks after each use." The locking mechanism must logically include a means to lock, unlock, and re-lock. The pawl, stop, and catch cooperate to provide all of these functions. The RSC-432 includes all elements of claim 1, including a "catch," and therefore infringes at least claims 1, 9.

Regarding claim 1 of the '928 patent, in Claim Chart III it can be seen that the RSC-432 includes the limitation of "a second portion that *operates against* a catch." In Fig. 11 the catch (174) is shown in contact with the second portion (180) of the pawl (120)

1   while bypassing the stop (188).  Spring (190) biases the pawl (120) downwards and

2   towards the stop (188), such that the second portion (180) *operates against* the catch (174)

3   by *applying a resistive force* provided by the spring (190).  Under this spring force, the

4   second portion (180) will force the catch (174) downwards, if the slider (118) were to be

5   lifted as shown then released.  Therefore, the second portion of the RSC-432 does indeed

6   operate against the catch while bypassing the stop.

7          Regarding claim 9 of the '928 patent, the RSC-432 includes the limitation that "the

8   catch acts upon a spring that exerts a force on the pawl."  Fig. 11 shows the slider (118) in

9   the actuated position, where the catch (174) is contacting the displaced pawl (120) against

10  the force of the spring (190).  Through the displacing of the pawl (120), the catch (174)

11  *acts and produces an effect* upon the spring (190) by stretching it and thereby producing a

12  force that acts on the pawl (34) to urge it in a direction opposite of the catch's travel.

13  Therefore the RSC-432 has a catch that acts upon a spring that exerts a force on the pawl.

14  **F.  The Votolato '928 Patent Claim 9 Is Not Invalid In View Of John**

15         Defendants contend that John teaches a "second portion [of a pawl] that operates

16  against a catch to bypass the stop."  See, Answer to Interrogatory No. 3 (Lauson Decl.,

17  para. 2, Ex. J).  John *does not teach* "a catch [that] acts upon a spring that exerts a force on

18  the pawl." Consider if John's projection (56) was to be contemplated as a catch, the strut

19  (34) a pawl, the tapered projection (58) a second portion, and the resilient arms (26, 28) a

20  spring.  Then, looking at John's Fig. 1, when the catch (56) pushes up the pawl (34) by

21  contact with the second portion (58), the catch (56) does not cause the spring (26, 28) to

22  deflect and thus, does not act upon the spring (26, 28).  *See* col. 5, lines 11-20.  Instead,

23  the spring (26, 28) is instead deflected by the opening of the blade guard (24).  *See* col. 5,

24  lines 33-36.

25         Further, John recites that the "strut 34 is pivotally joined by a thin membrane 36 or

26  may be hinged to the top of the guard member 24."  Col. 4, lines 58-60.  The springs (28)

27  molded to John's blade guard (24) can only push or pull the pawl (34) in a direction

28  parallel to the contact surfaces of the catch (56) and the second portion (58), such that *the*

16

1    *lifting action of the catch (56) does not work against the spring's biasing force.*

2    Therefore, John teaches away from an interaction between the spring (26, 28) and the

3    catch (56), since his "hinged" pawl (34), by the definition of hinge, cannot transmit a

4    spring force such that the catch (56) could act on the spring (26, 28). *See* col. 4, lines 59-

5    60.

6            Furthermore, the catch (56) could not act on the second set of resilient arms (38,

7    40) that are molded as part of the pawl (34), since the catch (56) acts on the pawl (34) at

8    the root where the resilient arms (38 and 40) extend from the base of the pawl (34).

9    Therefore, the catch (56) could not exert a torque to deflect the resilient arms (38 and 40)

10   such that a spring force may be produced. *See* Fig. 1.

11           John does not anticipate or make obvious claim 9 of the Votolato '928 patent, since

12   John teaches away from a catch (56) that either directly or indirectly acts on or has a

13   biasing effect on a spring (26, 28).

14   **G.  At Least Claim 9 Of The '928 Patent Is Not Invalid In View Of Marshall**

15           Defendants contend that Examiner erred in the analysis of the '928 patent,

16   regarding the length of the blade guard relative to the body in Marshall. See, Answer to

17   Interrogatory No. 3 (Lauson Decl., para. 2, Ex. J).  This argument is moot, since Marshall

18   does not teach or disclose that a second portion of a pawl operates against a catch *in order*

19   *to bypass the stop*, and lack any parts that are equivalent. The embodiments shown in

20   Figs. 6, 8 and 10 show a locking disk (52) mechanism that is rotated by pushing button

21   (55 or 72).  The abutment (57) normally prevents the retraction of the guard (39) by

22   blocking rod (41 or projection 94).  By rotating the disk counterclockwise, the abutment

23   (57)  is brought out of alignment with the rod (41 or 94) and the rod (41) may be

24   thereafter pushed in by applying pressure to the guard (39).

25           If the rod (41 or 94) was to be considered a "pawl coupled to the blade guard," the

26   end of the rod considered the "first portion," and the abutment (57) considered the "stop,"

27   *the rod (41) is lacking "a second portion that operates against a catch to bypass the stop."*

28   The rod (41) only operates against the abutment (57).  So, no portion of the rod (41) acts

1   to bypass the abutment (57).  The rod (41) is essentially passive in the actual unlocking

2   procedure, being permitted to retract only when the disk is separately rotated such that the

3   abutment (57) no longer blocks its movement.  *See* col. 7, lines 44-46 and Figs. 6 and 10

4   ("the disk 52 [is] … rotated through an angle by means of a lever 54").

5          The embodiments shown in Figs. 6 and 10 operate in a completely different

6   manner and produce different results than Votolato's claimed invention.  Marshall writes

7   that "it is theoretically possible for the user to hold the lever 54, 55 in its forward position

8   … after the cut has been finished" where the guards 39 are "still able to retract into the

9   handle." *See* col. 9, lines 42-48.  Unlike Votolato's device, the button 55 and lever arm 54

10  must be manually released by the user in order for the disc 52 to rotate back into a locking

11  position where the abutment 57 is in alignment with the rod 41.  "When the knife is

12  removed from the material, the springs 51 automatically extend the guards 39 to cover the

13  blade tip 20 *and the user releases the lever* 54, 55 so that the spring 58 returns the lever

14  and the disc 52 to the original rest position so as to prevent the guards 39 being retracted

15  once more." *See* col. 8, lines 20-25 (emphasis added).

16         The embodiment shown in Fig. 8 operates in a completely different manner and

17  produces different results than Votolato's claimed invention.  In the Fig. 8 embodiment,

18  the user must <u>first</u> push the guard against the cutting surface, <u>then</u> push the button in order

19  to effectively unlock the guard.  *See* col. 10, lines 10-13 ("When the user wishes to use the

20  knife to perform a cut, he presses the guard 39 against the surface to be cut and draws the

21  head 72 of the lever 69 back towards the rear of the slot 71.").  Otherwise, if the user

22  pushes the button to the unlock position without applying pressure to the guard, the disc

23  will simply snap back into the locked position, since the rod will not block its rotation.

24  *See* col. 10, lines 20-24 ("As the upper end of the lever 69 comes to the rear end of the slot

25  71 its lower end 73 snaps upwardly over the lobe 74 into the recess 76.").  Acting in an

26  opposite manner, with Votolato's claimed device <u>first</u> the trigger must be pushed in and

27  <u>only then</u> may pressure be applied to the blade guard to retract it.

28

1   Votolato's trigger may be depressed on the immediate approach to the cutting

2   surface, freeing the blade guard to retract upon contact, saving time and frustration.

3   **H.  Defendants' Improper Inventorship Defense Will Fail**

4   Defendants contend the '029 patent is invalid because all the inventors were not

5   named and Votolato filed a false oath, although Votolato since filed a petition to correct

6   inventorship on June 1, 2010.  See, PHC's Supplemental Responses to Plaintiff's First Set

7   of Interrogatories, No. 4, page 9  (Lauson Decl., para. 2, Ex. I). The Federal Circuit has

8   said even a strong showing of misjoinder of inventors will not necessarily preclude

9   imposition of a preliminary injunction, that incorrect inventorship is a technical defect in a

10  patent that may be easily curable;  and even assuming misjoinder, an inventor's persuasive

11  explanation of how such an error occurred will usually suffice to show a likelihood of

12  success on the issue of validity. Canon Computer Systems v. NuKote Int'l 134 F.3d 1085

13  (Fed. Cir. 1998).

14  Defendants' misjoinder defense lacks merit.  Votolato states he did not know until

15  recently that his industrial designer, who had assisted him and made material

16  contributions to the inventions, should have been named on the patents. (Votolato Decl.,

17  para. 12).  Additionally, Spellbound had at least three (3) written agreements with

18  Sharbaugh (and his company Point by Point Corp.) that Sharbaugh's work product would

19  be owned by Spellbound, and thus Spellbound had no motivation not to name him as a co-

20  inventor. Id., para. 13. Exs. E-G.

21  **I.  The Patents-In-Suit Are Otherwise Fully Enforceable**

22  Defendants speculate the John '640 patent is *"arguably* unenforceable" (emphasis

23  added), based on the maintenance fees not being timely paid such that the patent expired

24  for a time only to be resurrected by later, but have no substantial proof that the late

25  payment was intentional. See, Answer to Interrogatory No. 6 (Lauson Decl., para. 3, Ex.

26  J).  Defendants have no substantial evidence to back up their speculations.

27  Defendants contend Spellbound is estopped from asserting the patents-in-suit,

28  committed fraud or has unclean hands, because prior art was allegedly not disclosed to the

19

U.S. Patent & Trademark Office during prosecution of the applications. See, Answer of Pacific Handy Cutter, Answer of Front Line Sales, both filed June 25, 2010, Fourth, Seventh and Eighth affirmative defenses.  What must be established is: (1) prior art or information that is material; (2) knowledge chargeable to the applicant of that prior art or information and its materiality; and (3) failure of the applicant to disclose the art or information resulting from an intent to mislead the PTO. <u>FMC v. Manitowoc</u> 835 F.2d 1411 (Fed. Cir. 1987).  Defendants have nothing resembling such proof.

## IV.  Spellbound Will Suffer Irreparable Harm If Defs. Are Not Enjoined

Given the strong showing as to its likelihood-of-success, a presumption of irreparable harm may be presumed. <u>Polymer Tech. v. Bridwell</u> 103 F.3d 970, 974-75 (Fed. Cir. 1996).

If Defendants are not enjoined, Spellbound will suffer irreparable harm for many reasons, including lost sales of patented products and complimentary products, loss of market share, price erosion, loss of goodwill and damage to reputation, loss of opportunity to remain the clear market leader, loss of customers and business relationships, and the like. Votolato Decl., para 14, Ex. H.  The cases are legion as to these types of harms being irreparable: <u>Abbott Labs v. Sandoz</u>, 544 F.3d 1341, 1362 (Fed. Cir. 2008) (citing <u>Purdue Pharma v. Boehringer</u> 237 F.3d 1359, 1368 (Fed. Cir. 2001)(likelihood of price erosion and loss of market position are evidence of irreparable harm ("given the testimony of the likelihood of price erosion and loss of market position without corresponding market expansion from the introduction of [the accused infringer's] product, we see no deficiency in the district court's finding of irreparable harm")), <u>Bio-Tech Gen. v. Genentech</u> 80 F.3d 1553, 1566 (Fed. Cir. 1996)(loss of revenue, and research and development support constitutes irreparable harm: "the district court determined that [the patentee] would be harmed if [the accused infringer] were allowed to enter the marketplace because [the patentee] would lose revenues and goodwill, and would be required to reduce its research and development activities"), and <u>Polymer Tech v. Bridwell</u> 103 F.3d 970, 975-76 (Fed. Cir. 1996)(loss of market opportunities cannot be quantified or adequately compensated,

and is evidence of irreparable harm: "We have stated that, in the context of potential loss of market share, there is no presumption that money damages will be adequate . . . Competitors change the marketplace.  Years after infringement has begun, it may be impossible to restore a patentee's (or an exclusive licensee's) exclusive position by an award of damages and a permanent injunction.  Customers may have established relationships with infringers.  The market is rarely the same when a market of multiple sellers is suddenly converted to one with a single seller by a legal fiat.  Requiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option.")).[1]

    Spellbound's losses of sales it would have likely made are already having an impact, including slowing down development of new products and bringing them to market. Votolato Decl, paras. 10, 11.  Such harms have been recognized as irreparable. Decade Indus. v. Wood Tech. 100 F. Supp 2d 979, 983 (D. Minn. 2000)("the continued infringement of the accused product runs a serious risk of undermining a unique chance

---

[1] Other cases: Oakley v. Sunglasses Hut Int'l 61 USPQ2d 1658 (C.D. Cal. 2001), aff'd 316 F.3d 1331 (Fed. Cir. 2003)("there is a likelihood of erosion [to the patent owner's] market presence and its goodwill associated with its patented" product); Schwabel Corp. v. Conair Corp. 122 F. Supp. 2d 71, 83-84 (D. Mass. 2000)("Even apart from the presumption of irreparable harm, the loss of market share and business relationships due to infringement may independently constitute irreparable harm."); Chem. Trainer Indus. v. Wilkin 44 USPQ2d 1114, 1121 (C.D. Cal. 1997)("[i]njury to market share can constitute irreparable harm"); Colonial Data Tech. v. Cybiotronics 41 USPQ2d 1763, 1769 (D. Conn. 1996)("In addition to potential loss of sales, [patentee] also risks losing the opportunity to remain a leader and maintain its market share"); Allergen Sales v. Pharmacia & Upjohn 41 USPQ2d 1283, 1289 n. 3 (S.D. Calif. 1996)("because the activities of the accused infringer] not only threaten [the patentee's] market share, but also its good will and reputation, and because [patentee's] significant business is the sale of [patented product], the court finds [patentee] has sufficiently shown that it will suffer irreparable harm if the preliminary injunction is not granted"); Lifescan Inc. v. Polymer Tech. Int'l 35 USPQ2d 1225, 1240 (W.D. Wash. 1995)([patentee "is losing market share" to the accused infringer and the patentee "is likely to lose good will with its customers because of pricing differences between" the patentee's and accused infringer's products; Ethicon Endo-Surgery v. U.S. Surgical 855 F. Supp. 1500, 1515-16 (S.D. Ohio 1994)(patentee's persuasive arguments for irreparable harm included that sales of the patented products affect sales of other related products); CVI/Beta Ventures v. Custom Optical Frames 859 F. Supp. 945, 949-50 (D. Md. 1994)("there would be great risk of irreparable damage to Plaintiff's reputation, business good will, business growth and customer base" because Plaintiff distributes its products to one market segment and defendant will distribute its accused product to "discounters" who "may be expected to offer [products] for sale at substantially reduced prices as compared to the prices currently offered to Plaintiff's customers").

1    for [the patent owner] to gain . . . profits for further product development"). For these

2    harms, computation of damages will be difficult. A.W. Indus. v. Electronic Connector

3    Serv. 46 USPQ2d 1218, 1224 (S.D. Fla. 1997)("If Defendants are able to continue to draw

4    [the patentee's customers away by marketing alleged infringements of the patented

5    connectors to [the patentee's] actual customers . . . These damages are not easily

6    susceptible of measurement or quantification, and thus potential irreparable injury to [the

7    patentee] is present as to the patent infringement claim);

8           Although there is no evidence of other, unrelated infringers in the marketplace

9    (someone other than Defendants manufacturing or distributing products which infringe the

10   patents-in-suit), continued infringement by Defendants, including by their new big player

11   Stanley, may have an effect on third parties inducing other infringers to commence similar

12   activity, thereby forcing Spellbound to bring a multiplicity of suits or suffer further loss.

13   Votolato Decl, para. 15;  Amazon.com v. Barnesandnobel.com 239 F.3d 1343 (Fed. Cir.

14   2001)("Defendants' unchecked infringement will encourage others to infringe");

15   Boehringer Ingelheim Vetmedica v. Schering-Plugh 106 F.supp.2d 696, 703 (D. NJ

16   2000)(granting preliminary injunction; denial might injure patentee's "reputation . . . as it

17   will be perceived as a company which is unable to enforce the exclusivity of its patent

18   rights despite having proven liability and validity . . . Moreover, if this Court does not

19   grant [the patentee's] request for an injunction at this time, other would-be infringers will

20   no doubt be invited to infringe . . ."); Wang Labs v. The Chip Merchant 28 USPQ2d 1677,

21   1681 (S.D. Calif. 1993)(noting "additional concern that be continuing its alleged

22   infringement, defendant indirectly encourages others to disregard [plaintiff's] patent rights

23   . . . and to sell unlicensed [products]");

24          Defendants' expected argument that they have sufficient funds to fully compensate

25   Spellbound with monetary damages is insufficient to negate irreparable harm because it

26   ignores the accused infringer's effect on Spellbound's right to market exclusivity.

27   Hybritech v. Abbott Labs 849 F.2d 1446, 1456-57 (Fed. Cir. 1988)(the district court

28   properly relied on a wide range of factors in finding the existence of irreparable harm;

1   "because the principal value of a patent is in its statutory right to exclude, the nature of the

2   patent grant weighs against holding that monetary damages will always suffice to make

3   the patentee whole")

4       Other than to Defendants early only as part of an attempt to settle the litigation,

5   Spellbound has not marketed or offered licenses under the patents-in-suit.  Votolato Decl,

6   para. 7.  And Spellbound is promptly enforcing its exclusivity under the patents.  The new

7   Votolato '029 patent issued June 1, 2010, it being the most important of the patents-in-suit

8   as numerous claims are clearly infringed by Defendants.  Within days, on June 3rd

9   Spellbound filed its stipulated motion to amend the complaint and assert infringement of

10   the '029 patent.  The second-amended complaint was ordered filed on June 4th, and then

11   on June 25th Defendants answered that complaint asserting noninfringement and invalidity

12   of all the patents.  Just one business day ago, on July 16, 2010 Spellbound finally received

13   Defendants' supplemental interrogatory responses regarding the '029 patent, conceding

14   infringement but asserting invalidity primarily based on prior art references already

15   considered by the examiner.   Lauson Decl, para. 2, Ex. I.

16   Accordingly, Spellbound has proceeded with diligence in bringing this motion.

17      **V.  The Balance Of Hardships Weigh Sharply In Favor of Spellbound**

18       Once the patent owner establishes infringement and irreparable injury, the trial

19   court has considerable discretion whether to grant or deny the injunction, which is

20   exercised through a balancing of the relative conveniences and inconveniences. Reiffin v.

21   Microsoft 158 F. Supp.2d 1016 (N.C. Calif. 2001).  In comparing hardships, legitimate

22   considerations are that a large company distributing many products is less harmed by an

23   injunction because their survival will not be at risk, as compared to a smaller company

24   where sales of the patented products are its primary source of revenue and if the

25   infringement continues they may go out-of-business.  Precise Equip. v. Kmart 59 USPQ2d

26   1566 (C.D. Calif. 2000); Kristar Enterprises v. Revel Environmental Marketing 1998 WL

27   886623, *6 (N.D. Calif. 1998; Schawbel v. Conair 122 F.Supp.2d 71, 85 (D. Mass. 2000).

28      Spellbound, being a tiny entity with only about 8 employees, will endure extreme

1   hardship if forced to continue the litigation through trial as its market share continues to

2   erode as a result of Defendants' expanding infringement.  As a result of its innovation,

3   series of patents and sales efforts, Spellbound has a dominant position in the food service

4   and food processing industries.  Defendants are newcomers into this market.  Defendants

5   sell other similar safety knives which do not infringe the patents-in-suit or any patents

6   held by Spellbound.  Votolato Decl., paras. 8, 9, Ex. C.   Further, Defendant PHC is

7   owned by $14 billion American Capital, and thus have plenty of resources and their

8   viability is not threatened.  *See*, www.americancapital.com.  And Defendant Front Line is

9   now owned by $200 million St. Cloud Capital.  *See,*

10  http://www.stcloudcapital.com/portfolio.htm (listing Front Line Sales, Inc. and stating all

11  assets were acquired).

12           **VI.  The Public Interest Is In Enforcing The Patents-In-Suit**

13           Only rarely will the public interest be seriously affected by the grant or denial of a

14  preliminary injunction in a patent case.  Generally the public interest in enforcing valid

15  patents outweighs lower prices which may afforded by competition.  <u>Sidel v. Uniloy</u>

16  <u>Milacron</u> 61 USPQ2d 1481 (N.D. Ga. 2001); <u>Precise Exercise Equip. v. K-Mart</u> 59

17  USPQ2d 1566 (C.D. Calif. 2000).

18           Enjoining the accused products will not affect public health or safety, as

19  Defendants' other non-infringing safety cutters and Spellbound's patented products are

20  available for sale, and thus the public will not be deprived. Votolato Decl., paras. 8, 9.

21  Further, Spellbound has specific, concrete plans to expand marketing and sales of its

22  patented safety cutters to channels outside of food service/processing including retail in

23  the immediate future. Votolato Decl., para. 16.

24           **VII.  The Injunction Will Preserve The Status Quo**

25           The purpose of a preliminary injunction is to preserve the status quo and to protect

26  the respective rights of the parties pending a determination on the merits. <u>Cordis Corp. v.</u>

27  <u>Medtronic</u> 835 F.2d 859 (Fed. Cir. 1987).  The status quo to be preserved is the state of

28  affairs before the filing of the litigation – the last uncontested status that preceded the

pending controversy. <u>Litton Sys. v. Sundstrand Corp.</u> 750 F.2d 952 (Fed. Cir. 1984).  The concept of status quo is not intended to allow an infringer to continue infringing at the current rate, but rather prevents future trespasses without undertaking to assess the pecuniary or other consequences of past trespasses. <u>Atlas Powder v. Ireco Chems.</u> 773 F.2d 1230 (Fed. Cir. 1985).

After the John '640 patent-in-suit was acquired and the amended complaint filed and served in mid-December, 2009, the parties continuously negotiated a possible settlement and exchanged numerous draft agreements over the time period from January until May, 2010. Votolato Decl., para. 7.  Presumably Defendants are unwilling to waive confidentiality as to the content of such settlement discussions so they are not presented here.  Then in the first few days of June, 2010 the new Votolato '029 patent issued and the second-amend complaint was filed, and Spellbound learned of Stanley's  involvement in advertising and distributing the accused infringing Raze safety cutter product.  <u>Id.</u>, para. 8.

Despite Plaintiff's proper interrogatories and document requests served May 20, 2010 requesting sales information/documents for the accused infringing Raze product, and after Defendants' delay and the Protective Order not being entered until July 7, 2010, Defendants still are wrongfully withholding the sales information/documents. Accordingly, Plaintiff lacks detailed information/documents as to Defendants' sales volume.  Given that Stanley just commenced distributing the accused infringing product, however, sales are expected to dramatically increase in the second half of 2010 and into 2011.  The declaration of Mark Marinovich (PHC's President and CEO) filed July 6, 2010 describes PHC's intent in building a business relationship with Stanley, that the accused infringing Raze RSC-432 is being test marketed at Wal-Mart, and that "PHC is *only now* beginning to foster a solid business relationship with Stanley and be utilized by Stanley as a supplier." (emphasis added)  The preliminary injunction will prevent the crushing Stanley (Lowes, Home Depot, Wal-Mart, etc.) sales and preserve the status quo.

## VIII.  Only A Minimal Bond Should Be Required

The amount of any bond is in the wide discretion of the trial court. Kaepa v. Achilles 76 F.3d 624, 628 (5th Cir. 1996);  Bellsouth Telecomms. V. MCIMetro Access Trans. Servs. 425 F.3d 964, 971 (11th Cir. 2005); Fraige v. Classic 230 USPQ 223, 223 (C.D. Cal. 1985) ("This injunction is contingent upon posting by plaintiffs of a surety bond in the amount of five thousand dollars"); Robbins v. Stud Rail Mfg. Co. 32 USPQ2d 1882, 1885 (N.D. Ohio 1994)($5,000 sufficient).

In determining the amount of the bond, the Court  may consider Plaintiff's demonstrated likelihood of success on its claims and Plaintiff's ability to pay the bond. GoTo.com v. Walt Disney 202 F.3d 1199, 1211 (9th Cir. 2002)(court properly ordered nominal bond where higher amount demanded by defendant would effectively preclude injunctive relief); Decade Indus. v. Wood Tech. 100 F. Supp. 2d 979, 984 (D. Minn. 2000)("Given the strong likelihood that [the patent owner] will succeed on the merits of its infringement claim . . . the Court concludes that a bond of $10,000 is appropriate in this case."); Gordon Johnson v. Hunt 109 F. Supp. 571, 575 (N.D. Ohio 1952)("[The suggested bond] would in this case, on the basis of the information before me, effectively deprive the [patent owner] of the benefits of the decree; and also . . . would indicate a lack of confidence on the part of the court in its injunctive order").

Respectfully submitted,

LAUSON & TARVER LLP

Dated: July 19, 2010          By:    /s/
                                     _____
                                     Robert J. Lauson, Esq.
                                     Attorneys for Plaintiff
                                     Spellbound Development Group, Inc.